Davis *v.* Davis.

5-1232                                                              302 S. W. 2d 769

Opinion delivered June 10, 1957.

*Surrey E. Gilliam* and *Melvin E. Mayfield,* for appellant.

*James M. Rowan, Jr.* and *Brown & Compton,* for appellee.

CARLETON HARRIS, Chief Justice. Mrs. Mable Flaherty, age 59, a resident of Camden, suffered a stroke on October 7, 1948. Prior to such time, she had worked as a secretary at the South Arkansas Grocery, but never returned to work after suffering the stroke. On July 11, 1953, Mrs. Flaherty suffered a second stroke, and remained a total invalid thereafter.[1] Richard H. Davis, a brother, was duly appointed guardian on October 16, 1953. On December 7, 1953, subsequent to petition of the guardian, the court found that Arlene K. Davis, appellant herein, and former wife of Richard H. Davis, had in her possession certain postal savings certificates, series "E" U. S. Savings Bonds, and a pass book for a joint account of Mrs. Flaherty and Mrs. Davis in the Citizens National Bank of Camden, all of which belonged to Mrs. Flaherty, and ordered appellant to deliver same to the guardian. The court further found that Arlene K. Davis, in her response to the guardian's petition, alleged the existence of a trust relationship between Mable Flaherty and the respondent, (appellant) and had moved the court to transfer the cause to Chancery for the purpose of determining that issue. In compliance therewith, the court

---

[1] Mrs. Flaherty died subsequent to the trial of this cause, and her estate is being administered by the guardian under the provisions of Section 231 of Act 140 of 1949.

did make such transfer. The guardian, (appellee herein) filed a reply in Chancery Court on April 20, 1955, alleging that appellant was still holding funds and properties belonging to the incompetent, and that appellant should be required to render an accounting, and further required to make restitution of any funds or property which she had received from Mrs. Flaherty, and which had been applied to appellant's use or gain. Following the filing of various motions, the court proceeded to hear the cause on March 23, 1956, and entered its decree on May 31, 1956, in which the following findings were made:

1. That plaintiff's ward, Mable Flaherty, suffered a cerebral hemorrhage on or about October 7, 1948, and as a result thereof was rendered incompetent, and from such date was not legally competent to transfer or dispose of her property.

2. That during the month of February, 1952, Mrs. Flaherty had certain U. S. government bonds re-issued to add the name of the defendant, Arlene Davis, as co-owner. That on October 27, 1953, the defendant, Mrs. Davis, cashed these bonds and received therefor the sum of $12,200.75, and that said defendant converted said sum to her own use and benefit.

3. That on January 28, 1952, the said Mable Flaherty directed the Merchant & Planters Bank to add the name of Arlene Davis as co-owner of the savings account of Mrs. Flaherty in that bank. That between July 27, 1953, and December 7, 1953, the defendant withdrew from said bank account the sum of $1,236.50 and used the same for defendant's own benefit.

4. That sometime after October 7, 1948, the defendant, Arlene Davis, came into possession of a valuable diamond ring owned by Mrs. Flaherty and that the defendant now has said ring in her possession.

5. The court further finds that none of the said transactions constituted a valid legal gift.

In accordance therewith, the court rendered judgment for appellee against appellant in the total sum of

$13,437.25 together with interest at 6% per annum from such date until paid, and directed appellant to return the diamond ring to appellee. From such judgment comes this appeal.

Appellant first contends that the court was without authority to transfer the cause from Probate Court to Chancery Court, and erred in ordering such transfer; that all subsequent pleadings filed were of no effect whatsoever because the transfer was without any force or validity. The matter of transferring causes from Probate to Chancery Court was passed upon by this Court on November 26, 1956, in the case of *Merrell, et al.,* v. *Smith, Special Administrator, et al.,* 226 Ark. 1016, 295 S. W. 2d 624. There the Court approved such a transfer with the following language:

"* * * While it properly admitted the will to Probate, the Probate Court lacked the jurisdiction to decide the issue of specific performance of the alleged oral contract. The case must be, and is remanded with directions that it be transferred to equity for further proceedings."

Appellant argues that the mental incapacity of Mrs. Flaherty to make a gift is not shown by a preponderance of the evidence. This, of course, is the main issue in the litigation. No point would be served in reviewing all of the evidence. Some eleven witnesses, mostly neighbors, testified to the effect that Mrs. Flaherty did not act in her normal manner after suffering the first stroke in October, 1948. Most of the witnesses testified to a "silly giggle" that she developed after the stroke, occurring most of the time when nothing humorous had been said. Various witnesses testified that she had been a quiet, conservative type of person prior to the stroke, and that a marked difference was observed thereafter. It was testified that she would go to the back lot and transfer different trees and pine bushes, then go over to the next lot and bring back two or three brick in her hand; perhaps next day she would move the plants to another location and move the brick. She would sit on the wet and cold ground, and would go barefooted. In conversations,

she would not stay on one subject, would talk at random, and her answers to questions would not be responsive. She was careless about her personal appearance, whereas prior to the stroke she had been careful about her grooming and was attractive and neat. She wanted to give things away, and endeavored on one occasion to give an expensive Kodak to a neighbor who refused to accept it. Another neighbor, Mr. W. G. Hatch, testified that she would come over to his yard, steal his flowers, and take them over and put them in her yard; then she would weed her flowers and bring the weeds over into his yard. Mr. Hatch, whose home was only 8 or 10 feet from Mrs. Flaherty's bedroom, further testified that she frequently had crying spells, and would awaken him at night crying; that she would find a sunny spot in the yard and lie down "like a dog,"—and all of these actions had only occurred since the stroke. Her mother testified that Mrs. Flaherty had an "awful appetite" and would become angry when she felt she had not had enough to eat, would throw dishes around, and when her mother left the house, would go out and pull up the flowers in the yard. This was entirely contrary to her actions prior to the stroke.

On the other hand, a Camden banker and a Camden attorney, who witnessed the execution of a will by Mrs. Flaherty on March 19, 1951,[2] testified that at that time she appeared competent. The attorney, who prepared the will, testified that she seemed to have a clear understanding of the property she owned, and what she wanted to do with it. However, he stated that he had never seen Mrs. Flaherty except on two occasions, including this particular instance. Dr. Perry Dalton of Camden testified that from his observations of Mrs. Flaherty between 1948 and the time of the second stroke, nothing was noted in her mental behavior that would have necessitated a guardian; however, he stated he did not know her before the stroke, and assuming that she was the type of person

---

[2] The will left $10 to Mrs. Flaherty's daughter, $10 to her son, and the rest of her estate to appellant.

described in. the hypothetical question,[3] would say that there was more change in her reactions than he had observed and possibly more brain damage than. he had observed. Dr. John P. McAlister, who treated Mrs. Flaherty for diabetes for approximately two weeks in July of 1952, and also saw her on September 29, 1952, testified that, in his opinion, she was generally competent. He stated that she was aware of her surroundings and knew time, place, and person. He had not known Mrs. Flaherty before being called to attend her. Dr. McAlister stated that he did not believe she had the same mental aptness with regard to making decisions that she would have had, except for the stroke. He testified that he did not think she could make out the grocery list for the day, and doubted if she could think what had to be done in the house the next day, or could plan too much in the future, but at a given instant, she was competent. He stated that she was going through periods of melancholy. In his words, "In fact, I believe that most of the time she was very unhappy, but I will not put the stigma of insanity upon this woman." He further testified that he did not know, from his observation, as to whether she had sufficient mental competence to understand what property she owned. Joe Coan, cashier at the Merchant and Planters. Bank, testified that, at the time of the re-issuance of the bonds to include the name of appellant as co-owner, he had no doubts concerning Mrs. Flaherty's competence

[3] The following hypothetical question was propounded: "Q. Doctor, based upon your experience in the medical profession, if a woman who has been described by her neighbors, friends, and family as a quiet, reserved, intelligent person, who sought to improve her mind, who had worked continuously in secretarial capacity for a number of years, had been frugal in saving her money, had done nothing so far as her family and friends could observe that would be classed as abnormal or out of the way in any way; in other words, a person who is described as above average intelligence; if that person suffered a cerebral hemorrhage causing brain damage, temporary or permanent, or with or without healing, but anyway there was a cerebral hemorrhage, after that time, according to her family, neighbors, and friends, she was different in almost every respect, that she was subject to violent emotions, which she had never been subject to before, she had a hysterical giggle which occurred on many occasions when something was not funny, when she would go out in the yard and lie down in the sun like a dog, when she was unable to carry on any ordinary conversation that she had been able to carry on prior to that stroke, and taking all of those things into consideration, Doctor, would you say that such a person would be competent to handle her business affairs?" . . . . . : . · . . : : ·

or ability to understand what she was doing. He stated that he asked her that question, and she "flared up" at being asked, and said, "Yes, it is certainly my intentions, and I know exactly what I want done."

Appellant testified that Mrs. Flaherty and the members of her family did not get along well, that she (appellant) visited Mrs. Flaherty three times a day while she was in the hospital in 1953; that she had frequently given Mrs. Flaherty shots for her diabetes; that she often, after the stroke, would go by and carry Mrs. Flaherty riding in her car; that Mrs. Flaherty and her daughter frequently had words, and that the two would throw things at each other and would slap each other;[4] that Mrs. Flaherty's son, when young, lived with appellant and appellee (during their married life) for about three years. The evident point for this testimony was to show a reason for Mrs. Flaherty's alleged gift to appellant. In her words, "* * * So she told me one day she wanted to give me the bonds, is what she wanted to do, and I said, 'Oh, law, Mable, I don't know anything about something like that, I don't know anything about it at all,' and she said, 'Well, how can you do it?' and I said, 'Well, the only thing I know to do is just go see a lawyer, the only thing I know to do.' * * * Q. Did you ever at any time render any service to Mable Flaherty with the expectation of being rewarded for it or paid for it? A. Not one bit. Q. In reference to the particular bonds that are in controversy in this action, the bonds in which the original issue was cashed out in February of 1952 at Merchants and Planters Bank, at the time you testified about when Mable Flaherty gave the bonds to you, would you state to the court every expression that she said at the time she gave you those bonds? A. These bonds were in my box and after she had made, well, she had made the will before that, and she told me at this time, said 'Arlene, I want to give you these bonds.' And I said, 'Well, O. K.' So we went up there and she got them. I got the envelope out of the lock box, and she took the bonds out of there, and she signed

_____
[4] These alleged difficulties between mother and daughter occurred before the stroke.

them and she gave them to me. She said, 'Now I want you to have them and you can do whatever you want to with them.' She says, 'Now I want to give them to you. You can do whatever you want to with them.' So that's what she did.'' With reference to the ring:

''Q. Did you ever have any discussions with Mable Flaherty, other than the ones you have mentioned here about the bonds, pertaining to any other properties that Mable Flaherty owned or had possession of?

A. Well, yes, she, back in I guess '49 or '50 she gave me her ring, and she gave it to me one day, and she said, 'I want you to have it; I won't wear it any more; but now you know the mounting is worn and you can't wear it until it is fixed.' But she said, 'You can have it fixed and wear it.' And of course I didn't get it fixed right then, I just kept it and finally one day she said, 'Why don't you go ahead and get the ring fixed and go ahead and wear it?' And so I had it remounted, and then I have been wearing it ever since. And she told me she wanted me to have it, to keep it just as long as I lived.''

Appellant does not contend that any part of the monies in the bank were given to her, but states that such sums expended were used entirely for the benefit of Mrs. Flaherty. However, no statements or bills which she had paid on behalf of the latter were placed in evidence.

After a careful study of the testimony in this cause, we are unable to say that the Chancellor's findings are against the preponderance of the evidence. It is noteworthy that appellee's witnesses were, on the whole, much better acquainted with Mrs. Flaherty than the witnesses on behalf of appellant; likewise, they had better opportunity to observe her actions, and according to the evidence, did, much more often, see and talk with her. It must also be remembered that neither of the physicians knew Mrs. Flaherty before being called in attendance.

To summarize, the question as to whether Mrs. Flaherty was competent or incompetent from the period after October 7, 1948, resolves itself into purely a question as

to what evidence made the most profound impression on the court. The Chancellor heard the case, had the opportunity to observe the demeanor of the witnesses, apparently gave close study to the testimony, and the contentions of each litigant. The rule, so many times reiterated, is to the effect that while this Court tries Chancery cases *de novo,* still it will not reverse a Chancellor's decree unless his findings are against the weight of the evidence. *Lupton* v. *Lupton,* 210 Ark. 140, 194 S. W. 2d 686 (1946). We are unable to make such a finding in this cause.

This determination makes unnecessary any discussion of the court's finding that none of the transactions constituted a valid legal gift.[5]

The judgment of the chancery court is affirmed in its entirety.

---

[5] This finding was based upon the fact that since Mrs. Flaherty remained a co-owner of the bonds, and upon gaining possession, could have cashed them at any time herself, no absolute gift was made.